

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW YORK *ex rel.* GARY TUCKER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CATHOLIC HEALTH SYSTEM, INC., | ) ) |
| Defendant. | ) ) ) |

Case No. __20__ __C V 1482__

**DEMAND FOR JURY TRIAL**

FILED IN CAMERA/UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730

## RELATOR'S ORIGINAL COMPLAINT

Gary Tucker ("Relator") brings this action against Defendant Catholic Health System ("Catholic Health") on behalf of the United States of America and the State of New York through the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("False Claims Act" or "FCA") and the New York False Claims Act, *State Finance Law*, Art. 13, §§ 187-194 ("New York False Claims Act"). Relator seeks to recover all available damages, penalties, and remedies against Defendant for its violations of the False Claims Act and the New York False Claims Act detailed herein.

## INTRODUCTION

1.      This is an action under the False Claims Act and the New York False Claims Act to recover damages and civil penalties from Defendant for knowingly submitting, or causing to be submitted, false claims to government health care programs, including, but not limited to, Medicare and the New York Medicaid program, and for knowingly offering,

2

paying, soliciting, and/or accepting remuneration in exchange for medical referrals in violation of federal and New York state law.

2.     Relator is the former Chief Executive Officer for Mount St. Mary's Hospital in Lewiston, New York. Relator retired in October 2019 after approximately 40 years of experience in the health care industry.

3.     Beginning in or around 2015, Defendant Catholic Health acquired Mount St. Mary's Hospital. Relator was promoted from Chief Operating Officer of Mount St. Mary's Hospital to its Chief Executive Officer.

4.     In or around 2017, Relator was assigned to be part of an internal team evaluating and auditing Catholic Health's financial arrangements with physicians, including arrangements under which Catholic Health paid physicians for purported administrative work and for serving as medical directors at Catholic Health's facilities.

5.     As part of the review of these financial arrangements, Relator and his team were looking for areas to reduce costs. However, once Relator and his team began evaluating the financial arrangements, Relator grew increasingly alarmed at what he discovered.

6.     Relator learned that Catholic Health spent millions of dollars each year on arrangements with physicians who made substantial referrals to Catholic Health. Yet, in the majority of the arrangements reviewed, there were no timesheets documenting any of the work purportedly done by the referring physicians to justify payments from Catholic Health. Moreover, during the audit process, Relator asked how Catholic Health knew how much to pay physicians when the doctors were not submitting timesheets. Relator recalls

3

someone suggesting that the doctors had been placed on "auto-pay" for the same amounts each month.  Relator discovered that, even after some of these contracts had expired by their terms, Catholic Health continued paying the physicians.

7.      Importantly, Relator did not permit these abuses at Mount St. Mary's Hospital, the facility for which he had served as Chief Executive Officer.  Instead, these unlawful kickback arrangements, apparently meant to drive referrals to Catholic Health, were occurring at other facilities owned by Catholic Health.

8.      Relator raised concerns internally and began pushing for appropriate time and attendance oversight of physicians who were contracted to provide administrative services to Catholic Health.

9.      Relator helped uncover massive compliance failures and the payment of illegal remuneration to physicians that resulted in the submission of false claims to government payors.  Relator now brings this action to ensure American and New York taxpayers are repaid all amounts Defendant owes to them.

PARTIES

Plaintiffs

10.     Relator Gary Tucker is an individual citizen of the United States of America residing in Sun City West, Arizona.  He has direct, first-hand, and independent knowledge of conduct giving rise to this lawsuit.  Relator is a former employee of Catholic Health.  During the regular course of his employment, Relator had access to information as part of his job duties and responsibilities that supports the claims brought herein.

4

11.     The United States of America is a Plaintiff and real party in interest as set forth in the False Claims Act.  Relator seeks recovery on behalf of the United States for amounts paid by the United States as a result of false claims submitted, or caused to be submitted, by Defendant, as well as all applicable penalties.

12.     The State of New York is a Plaintiff and real party in interest as set forth in the New York False Claims Act.  Relator seeks recovery on behalf of the State of New York for amounts paid by New York Medicaid as a result of false claims submitted, or caused to be submitted, by Defendant, as well as all applicable penalties.

**Defendant**

13.     Defendant Catholic Health System is a New York not-for-profit corporation. Defendant Catholic Health System is located at 144 Genesee Street, Buffalo, New York 14203.  Defendant can be served at its headquarters at 144 Genesee Street, Buffalo, New York 14203, and/or through an authorized officer or agent.

## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

14.     Defendant Catholic Health is vicariously liable for the actions and omissions of its executives, employees, and agents.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over these claims brought under the False Claims Act, 31 U.S.C. §§ 3279, *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732, 28 U.S.C. § 1331, and 28 U.S.C. § 1345.  This Court has supplemental jurisdiction to entertain the New York causes of action under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

5

16.    This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because that section of the False Claims Act authorizes nationwide service of process, implicating the National Contacts Test for personal jurisdiction, and because Defendant operates and transacts business in the Western District of New York.

17.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1395(a) because Defendant operates and transacts business in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

18.    Relator is not aware of any public disclosures of the allegations and transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730.

19.    A copy of this Complaint is being served upon the Attorney General for the United States, the United States Attorney's Office for the Western District of New York, and the New York Office of the Attorney General.  A written disclosure statement setting forth all material evidence and information Relator possesses is also being submitted to these offices as required by 31 U.S.C. § 3730(b)(2).  *See* Fed. R. Civ. P. 4(d)(4).

20.    Relator is the original source of the information forming the basis of this action because he possesses direct and independent knowledge of non-public information upon which the allegations herein are based.  *See* 31 U.S.C. § 3730(e)(4)(B).  Relator acquired non-public information during his employment that is independent from and materially adds to any publicly disclosed information relating to Defendant's violations described herein.

21.    Relator has complied with all conditions precedent to bringing this action.

## LEGAL FRAMEWORK

A. The Medicare Program

22.     In 1965, Congress enacted The Health Insurance Program for the Aged and Disabled through Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, ("Medicare"). Medicare is a federal health care program providing benefits to persons who are over the age of 65 and some under that age who are blind or disabled. Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency under the Department of Health and Human Services (HHS). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

23.     Medicare is a "Federal health care program," as defined in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(f).

24.     The Medicare Program includes various "Parts," which refer to the type of service or item covered. Medicare Part A, for instance, authorizes payment of federal funds for, among other things, medically necessary inpatient hospital care. Medicare Part B covers, among other things, medically necessary outpatient care, physician services, and diagnostic laboratory services.

25.     Medicare reimburses only reasonable and necessary medical products and services furnished to Medicare beneficiaries and excludes from payment services that are not reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.115(k).

Providers[1] must provide medical services to Medicare beneficiaries "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

26.    Medicare utilizes "Medicare Administrative Contractors," sometimes referred to as "fiscal intermediaries" or "carriers," to administer Medicare in accordance with rules developed by CMS.  These contractors are charged with and are responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

27.    CMS hires these contractors to review, approve, and pay Medicare claims received from health care providers.  Given that it is neither realistic nor feasible for CMS or its contractors to review all relevant medical documentation before paying each claim, payment is generally made under Medicare in reliance upon the provider's enrollment obligations as well as certifications on Medicare claim forms that services in question were "medically indicated and necessary for the health of the patient."  In other words, Medicare and other federal health care programs are "trust-based" systems.

28.    Medicare will only reimburse costs for medical services that are necessary for the prevention, diagnosis, or treatment of a specific illness or injury.

29.    Certification attestations on Medicare enrollment forms, claim submissions, and Medicare Cost Reports play an important role in ensuring the integrity of the Medicare Program.  *See* 42 C.F.R. § 413.24(f)(4)(iv).

---

[1] Relator uses the term "providers" herein to include all health care practitioners, providers, and suppliers, notwithstanding definitional differences between "providers" and "suppliers" in some regulations.

8

30.     Medicare enters into agreements with providers to establish their eligibility to participate in Medicare.  Providers complete a Medicare Enrollment Application (often called a Form CMS-855A) whereby the providers must certify compliance with certain federal requirements.  Among other things, providers agree as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction comply with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*Id.*  All providers participating in Medicare share these obligations.

31.     The Medicare Enrollment Application also summarizes the False Claims Act in a separate section explaining the penalties for falsifying information in the application to "gain or maintain enrollment in the Medicare program."  *Id.* § 14.

32.     As further detailed below, Defendant illegally caused taxpayer funds to be paid from Medicare arising from violations of the Anti-Kickback Statute and the Stark Law.

## B. Veterans Affairs Health Benefit Programs and TRICARE

33.     The Department of Veterans Affairs (VA) administers health benefit programs and pays for certain medical services.  For instance, one of those programs is the Civil Health and Medical Program of the Department of Veterans Affairs, also known as "CHAMPVA," which provides health insurance coverage to dependents of veterans with disabilities or who are deceased.

9

34.    TRICARE is a separate health benefit program administered by the Department of Defense, which covers certain military service members, military retirees, and families of service members and retirees.

## C. New York Medicaid Program

35.    The Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, administered in the State of New York as the New York Medicaid program ("New York Medicaid"), is a health care benefit program jointly funded and administered by the State of New York and the United States. CMS administers Medicaid on the federal level.  Medicaid helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs.

36.    The United States funds approximately fifty percent of each New York Medicaid payment made to Medicaid providers.  This federal share is known as the Federal Medical Assistance Percentage (FMAP).

37.    New York Medicaid is a "Federal health care program," as defined in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(f).

38.    As further detailed below, Defendant illegally caused taxpayer funds to be paid from New York Medicaid arising from violations of the Anti-Kickback Statute and the Stark Law.

## D. Fraud and Abuse Statutes

39.    According to the HHS-Office of the Inspector General ("HHS-OIG"), "[t]he five most important Federal fraud and abuse laws that apply to physicians are the False

10

Claims Act (FCA), the Anti-Kickback Statute (AKS), the Physician Self-Referral Law (Stark law), the Exclusion Authorities, and the Civil Monetary Penalties Law (CMPL)."[2]  At least three of these fundamental fraud and abuse laws, as well as the New York False Claims Act, are at issue in this action.

(i)     **The False Claims Act**

40.     The False Claims Act imposes liability to the United States upon any individual who, or entity that, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B); or conspires to commit a violation of the False Claims Act, § 3729(a)(1)(C).  Further, Section 3729(a)(1)(G), known as the "reverse false claims" provision, imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* § 3729(a)(1)(G).

41.     "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. *Id.* § 3729(b)(1).  The False Claims Act does not require proof of specific intent to defraud in order to establish a violation.  *Id.*

---

[2]     HHS-OIG, *A Roadmap for New Physicians, Fraud & Abuse Laws,* https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited Oct. 5, 2020).

42.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, 28 C.F.R. § 85.5, and 85 Fed Reg. 37004-37010 (June 19, 2020), the applicable per-false-claim penalty under the False Claims Act assessed after January 19, 2020 is a minimum of $11,665 up to a maximum of $23,331.

(ii)     **The Anti-Kickback Statute**

43.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal statute that makes it illegal for individuals or entities to knowingly and willfully solicit or receive "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1).

44.     The Anti-Kickback Statute also makes it illegal for individuals or entities to knowingly and willfully offer or pay "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

45.     The Anti-Kickback Statute further prohibits the solicitation, receipt, offer, and payment of any remuneration in exchange for referrals of individuals for services or items reimbursed in whole or in part by a Federal health care program. 42 U.S.C. § 1320a-7b(b). A "Federal health care program" includes any program providing health benefits

12

that is funded directly, in whole or in part, by the United States, including, among others, Medicare, Medicaid, VA health benefits, and TRICARE. *See id.* § 1320a-7b(f).

46.    Payments of remuneration to induce patient referrals for services reimbursed with federal health care funds constitute illegal remuneration under the Anti-Kickback Statute.  Violation of the Anti-Kickback Statute is a felony punishable by fines and imprisonment.  42 U.S.C. § 1320a-7b(b)(2).

47.    The Anti-Kickback Statute arose out of Congress's concern that health care decisions would be inappropriately induced through the payment of remuneration (*i.e.*, things of value), which would undermine the goals of ensuring fair competition for federal funds and providing the highest quality of health care to patients in a market driven by quality of care, not financial incentives.  To protect the Medicare and Medicaid programs, among other federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form.  Congress has strengthened the Anti-Kickback Statute on multiple occasions since its enactment to ensure that kickbacks masquerading as legitimate transactions do not evade the statute's reach.

48.    As amended by the Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. No. 111-148, § 6402(f), the Anti-Kickback Statute provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g). According to the ACA's legislative history, this amendment to the Anti-Kickback Statute was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are

not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854. In other words, compliance with the Anti-Kickback Statute is material to the government's payment decisions.

49. HHS-OIG has promulgated "safe harbor" regulations that identify payment practices that are not subject to the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Safe harbor protection is afforded only to those arrangements that meet *all* of the specific conditions set forth in the safe harbor. Defendant's conduct detailed herein does not enjoy the protection of any safe harbor.

50. Compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a condition of payment under federal health care programs, and providers participating in the Medicare and Medicaid programs must agree to comply with the Anti-Kickback Statute and certify such compliance.

(iii)   The Stark Law

51. The Stark Law was enacted by Congress to address the overutilization of services by physicians who stood to profit from referring patients to facilities in which they had a financial interest—so-called "self-referrals." The Stark Law, as well as the regulations promulgated thereunder, prohibits physicians who have a "financial relationship" with an entity from making a "referral" to that entity for the furnishing of certain "designated health services" that may be reimbursed by the United States under the Medicare Program. 42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.353(a). An entity may not submit for payment

a Medicare claim for services rendered pursuant to a prohibited referral. 42 U.S.C. §
1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).

     52.    The Stark Law defines "designated health services" to include a variety of
services, including clinical laboratory services and inpatient and outpatient hospital
services. 42 U.S.C. § 1395nn(h)(6); 42 C.F.R. § 411.351.

     53.    The Stark Law and its implementing regulations define a "financial
relationship" to include, among other things, "a direct or indirect ownership or investment
interest" in or "a direct or indirect compensation arrangement" with an entity that provides
designated health services. 42 U.S.C. §§ 1395nn(a)(2), (h)(1); 42 C.F.R. § 411.354(a).

     54.    The Stark Law and its regulations provide that certain enumerated
arrangements are excepted from the Stark Law's coverage. *See* 42 U.S.C. §§ 1395nn(b)-
(e); 42 C.F.R. § 411.351. Importantly for this action, Stark Law exceptions often require
that remuneration paid to physicians under an arrangement, among other things, not
exceed fair market value and not be determined in a manner that takes into account the
volume or value of any referrals or business generated between the parties to the
arrangement. *See* 42 C.F.R. § 411.357(d).

     55.    By law, the United States may not pay a claim for a designated health service
referred or provided in violation of the Stark Law. 42 U.S.C. § 1395nn(g)(1).
Additionally, entities must reimburse any payments that are mistakenly made by the United
States. 42 C.F.R. § 411.353(d).

(iv)    New York False Claims Act

56.    The New York False Claims Act also applies to Defendant's conduct at issue in this action, specifically related to New York Medicaid payments made as a result of false claims submitted, or caused to be submitted, by Defendant.

57.    The New York False Claims Act imposes liability to New York upon any individual who, or entity that, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *State Finance Law*, Art. 13, § 189(1)(a); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 189(1)(b); or conspires to commit a violation of the New York False Claims Act, § 189(1)(c). Further, Section 189(1)(h) imposes liability upon any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or local government." *Id.* §§ 189(1)(h).

58.    "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. *Id.* § 188(3)(a). The New York False Claims Act does not require proof of specific intent to defraud in order to establish a violation. *Id.* § 188(3)(b).

59.    The New York False Claims Act provides for per-false-claim penalties equal to the civil penalties available under the False Claims Act, 31 U.S.C. § 3729. *Id.* § 189(h). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, 28 C.F.R. § 85.5, and 85 Fed Reg. 37004-37010 (June 19, 2020), the applicable per-false-claim penalty under the False Claims Act assessed after January 19, 2020 is a minimum of $11,665 up to a maximum of $23,331

## DEFENDANT'S UNLAWFUL CONDUCT

60.    This case arises from Defendant Catholic Health's payment of illegal remuneration to referring physicians and/or physician practices resulting in referrals made in violation of the Anti-Kickback Statute and the Stark Law.   After receiving patient referrals tainted by illegal financial arrangements with referring physicians, Catholic Health then billed federal payors and New York Medicaid for services performed on or for these unlawfully referred patients.

61.    Catholic Health is "one of the largest health systems in Western New York, serving hundreds of thousands of patients across its network of hospitals, long-term and subacute care facilities, primary care centers, home care agencies, rehabilitation services, and diagnostic [and] treatment centers."[3]  According to its 2018 Annual Report Video on its website, Catholic Health had net patient revenue of $1.2 billion and $20.1 million in income from operations.[4]

62.    Catholic Health provides services to federal program beneficiaries and New York Medicaid beneficiaries.

63.    Catholic Health competes with other hospital systems in Western New York. One of Catholic Health's primary competitors is Kaleida Health.   One purpose of the financial arrangements with physicians detailed below was to induce referrals, the lifeblood

---

[3] Catholic Health, *Our History*, https://www.chsbuffalo.org/about-us/our-history (last visited Oct. 1, 2020).

[4] Catholic Health, *Annual Report*, https://www.chsbuffalo.org/about-us/annual-report (last visited Oct. 1, 2020).

of a health system.  As explained below, Catholic Health and Kaleida Health often competed for business from the same physician referral sources.

64.    Relator began working as a consultant at Mount St. Mary's Hospital in or around 2005. He became Mount St. Mary's Hospital's Chief Operating Officer in or around 2008.

65.    In 2015, Mount St. Mary's Hospital completed an asset merger with Defendant Catholic Health.  Relator became Chief Executive Officer of Mount St. Mary's Hospital, then owned by Defendant Catholic Health.

**A. Relator is Assigned to a Task Force to Review Catholic Health's Operational Effectiveness and Physician Financial Arrangements.**

66.    As CEO of Mount St. Mary's Hospital following the merger, Relator worked to complete the merger and to help ensure an efficient operational transition.

67.    In 2017, Catholic Health assigned Relator to a task force reviewing operational effectiveness and budget issues that included a review of financial arrangements between Catholic Health facilities and physicians.  The team's aim was to reduce costs for administrative physician roles such as department chairs, associate chairs, and medical directors.

68.    Relator's team included Catholic Health's Senior Vice President of Medical Affairs, Dr. Brian D'Arcy, as well as Vice Presidents of Medical Affairs from each of Catholic Health's hospitals.  Other hospital CEOs were later added to the team.

69.    The group began collecting data related to physician contracts, physician payments, and the hospital system used to manage the agreements with physicians.  The group approached the review process by dividing up the financial arrangements into five

categories: (1) administrative physician positions, (2) hospital-based physicians and physician groups, (3) paid physician call coverage, (4) graduate medical education, and (5) physician employees.

70.    Relator soon discovered grievous compliance failures, particularly surrounding the administrative physician roles. Some of the recipients of the remuneration, such as the vascular surgeons described below, were prolific referrers to Defendant. Catholic Health's payments to at least a portion of these physicians were intended to induce referrals, were not compliant with federal law, and did not demonstrate arm's-length, bona fide economic arrangements.

**B. Relator Discovers Abusive Physician Administrative Services Arrangements.**

71.    During its review process, Relator's team collected approximately 100 physician contracts pertaining to the following Catholic Health hospitals: Kenmore Mercy Hospital, Sisters of Charity Hospital (including the St. Joseph campus), Mercy Hospital of Buffalo, Mount St. Mary's Hospital, and Catholic Health's corporate office.

72.    Around this time, Relator learned Catholic Health was spending approximately $2.5 million a year for physician administrative services unrelated to formal medical staff duties. Relator also discovered that many of the agreements used the same boilerplate language and sometimes defined vague duties and obligations. Relator found that a significant portion of these arrangements involved physicians serving as "physician advisors" in Catholic Health's corporate office, where no patients were treated.

73.    Based on Relator's audit and his experience with Catholic Health's leadership, Relator concluded that these financial arrangements appeared to be designed to

induce referrals. This conclusion is supported by the fact that Relator's team discovered dozens of financial arrangements with physicians going back years that, although payments were being made to doctors, completely lacked timesheets or documentary support justifying the payments made. This lack of support primarily existed at the Catholic Health corporate level, Mercy Hospital of Buffalo, and Sisters of Charity Hospital.

74.    Maintaining documentation such as time records establishing the amount of work performed by a physician under a financial arrangement with a hospital is a standard practice required to ensure the payment of fair market value for services rendered in compliance with federal law. Defendant knew this and kept time and attendance records in some situations.

75.    Based on his recollection of documents reviewed, Relator provides examples of abusive, non-compliant physician financial arrangements below. These examples are not exhaustive.

**Paul Anain, M.D. and Roger Walcott, M.D.**

76.    Relator recalls reviewing an agreement between Catholic Health and Paul Anain, M.D., calling for Dr. Paul Anain to serve as the Director of Vascular Services for Catholic Health in exchange for approximately $150,000 a year. Relator recalls the contract requiring approximately 20 hours of work a week by Dr. Paul Anain.

77.    Similarly, Relator recalls Dr. Paul Anain's partner, Roger Walcott, M.D., having an agreement with Catholic Health to serve as the Associate Director of Vascular Services in exchange for approximately $50,000 a year. Relator recalls the contract requiring Dr. Walcott to work approximately five hours a week.

78.    Paul Anain, M.D. and Roger Walcott, M.D. were previously vascular surgeons at Vascular Surgery Associates.

79.    Catholic Health's competitor, Kaleida Health, opened its "Global Vascular Institute" in or around 2012. Upon information and belief, Catholic Health's management grew concerned about losing patient referrals to the Global Vascular Institute and entered into or extended financial arrangements with Dr. Paul Anain and Dr. Roger Walcott to compete with Kaleida Health for those referrals.

80.    Relator recalls then-Chief Medical Officer Brian D'Arcy stating openly in one or more meetings during this review period that he did not like these particular arrangements because the physicians "did nothing to earn the money."

81.    Dr. D'Arcy's comment is consistent with Relator's review of these arrangements. In an audit from 2018, Relator found no timesheets submitted by Dr. Paul Anain or Dr. Roger Walcott justifying payments under these $200,000-a-year arrangements. Based on his review of the data and his memory, Relator believes the payments Catholic Health made under these agreements were processed automatically.

82.    Dr. Paul Anain and Dr. Roger Walcott were referral sources for Catholic Health. Upon information and belief, during the time period relevant to this action, these physicians accepted federal payor beneficiaries and/or referred federal payor beneficiaries to Catholic Health, and Catholic Health billed federal payors for services rendered to these beneficiaries.

21

<u>Robert Armstrong, M.D.</u>

83.    Relator recalls reviewing an agreement between Catholic Health and Robert Armstrong, M.D., calling for Dr. Armstrong to serve as a Physician Advisor for Care Management for Catholic Health in exchange for approximately $78,000 a year.  Relator recalls the contract requiring approximately 10 hours of work a week by Dr. Armstrong.

84.    Dr. Robert Armstrong is or was a general surgeon at Surgical Associates of Western New York, PC.

85.    Just as the audit from 2018 exposed related to the above arrangements, Relator found no timesheets submitted by Dr. Armstrong justifying payments under this arrangement.  Based on his review of the data and his memory, Relator believes payments Catholic Health made under these agreements were processed automatically.

86.    Dr. Armstrong was a referral source for Catholic Health.  Upon information and belief, during the time period relevant to this action, Dr. Armstrong accepted federal payor beneficiaries and/or referred federal payor beneficiaries to Catholic Health, and Catholic Health billed federal payors for services rendered to these beneficiaries.

<u>Joseph Anain, DPM</u>

87.    Similarly, Relator recalls reviewing two agreements between Catholic Health and Joseph Anain, DPM (a relative of Dr. Paul Anain) calling for him to serve as Chair of Podiatry as well as providing Graduate Medical Education (GME) services for Catholic Health.  Combined, these agreements provided that Catholic Health would pay Dr. Joseph Anain approximately $92,000 a year.

88.    Just as the 2018 audit exposed in the above arrangements, Relator found no timesheets submitted by Dr. Joseph Anain or other records showing he had performed his obligations to justify payments under these arrangements.  Based on his review of the data and his memory, Relator believes payments Catholic Health made under these agreements were processed automatically.

89.    Dr. Joseph Anain was a referral source for Catholic Health.  Upon information and belief, during the time period relevant to this action, Dr. Joseph Anain accepted federal payor beneficiaries and/or referred federal payor beneficiaries to Catholic Health, and Catholic Health billed federal payors for services rendered to these beneficiaries.

<u>Additional Unsubstantiated Payments to Physicians</u>

90.    The examples above represent only a handful of the arrangements under which Relator and his team found no documentation of actual services performed by doctors to justify remuneration paid by Catholic Health to those referral sources.

91.    Relator discovered dozens of similar agreements with physicians purporting to justify hundreds of thousands of dollars in payments to non-employed physicians.  In many of these instances, Relator's team found no timesheets.  In addition, the information reviewed by Relator indicated that Catholic Health payments under these agreements were processed automatically, sometimes even after a contract had expired by its own terms.

92.    Upon information and belief, some of the physicians referred federal payor beneficiaries (including New York Medicaid patients) to Catholic Health, and Catholic

Health billed federal payors (including New York Medicaid) for services rendered to these beneficiaries.

93.     However, importantly, not all arrangements reviewed by Relator and his team were completely devoid of documentation and timesheets establishing the work done by a physician to justify payments from Catholic Health. In, Relator's hospital—Mount St. Mary's Hospital—maintained timesheets and ensured the relatively few physician arrangements were compliant. The existence of timesheets in other arrangements establishes that Catholic Health knew work should actually be performed and documented to justify payment. However, for dozens of other arrangements, Catholic Health apparently turned a blind eye, did not investigate whether physicians were actually performing services, and simply made payments to referral sources. This is illegal.

94.     It is not economically reasonable to make tremendous financial outlays for services without first confirming that the work was actually performed. On information and belief, Catholic Health knows this because it requires some or all of its employees to submit timesheets or use automated time clocks to determine appropriate employee wages. However, because physicians are in a position to make referrals, Catholic Health continued paying remuneration without receiving equivalent value in exchange.

95.     Relator understood that the audit he was tasked with facilitating rose out of a general concern that physicians were not performing services but Catholic Health was paying them as if they were.

96.     In and around May 2019, Relator began pushing Catholic Health's leadership to properly manage physicians to ensure they were working and documenting

time to justify payments under their contracts. Relator similarly pressed for certain hospitalist contracts to be bid through a request for proposal process.

97.    Later that year, Relator retired. Relator never witnessed Catholic Health voluntarily disclosing these violations or repaying the United States or the State of New York.

98.    Catholic Health's payment of remuneration to referral sources in the absence of services or proof of services is economically unreasonable as well as illegal. Catholic Health cannot establish that remuneration paid in the absence of timesheets is either warranted or consistent fair market value. In fact, by definition, payment for work not performed is not fair market value.

99.    Catholic Health's failure to ensure physicians were in fact properly earning remuneration by providing valuable services evidences that at least one purpose behind some of the arrangements was to induce referrals. Relator brings this action to ensure the taxpayers are repaid all amounts Catholic Health unlawfully billed for patient referrals tainted by Anti-Kickback Statute and Stark Law violations.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

Violations of the False Claims Act: False Claims for Payment
31 U.S.C. § 3729(a)(1)(A)

100.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

101.    Through the acts and omissions alleged above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

102.    Defendant violated the False Claims Act by submitting, or causing to be submitted, claims for reimbursement from federal health care programs, including Medicare, TRICARE, VA health benefit programs, and New York Medicaid, knowing that those claims were ineligible for the payments demanded.

103.    False claims submitted, or caused to be submitted, by Defendant included claims tainted by Anti-Kickback Statute and Stark Law violations.

104.    Each claim submitted as a result of the Defendant's illegal conduct represents a false claim.

105.    The United States, unaware of their falsity, paid and may continue to pay claims that would not be paid but for Defendant's unlawful conduct.

106.    Defendant's conduct described herein was knowing, as that term is used in the False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

107.    By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

SECOND CLAIM FOR RELIEF

Violations of the False Claims Act:  Use of False Statements
31 U.S.C. § 3729(a)(1)(B)

108.  Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

109.  Defendant knowingly used or caused to be made or used false records or statements that were material to false or fraudulent claims for payment submitted to federal health care programs.  Those false records or statements used or caused to be used by Defendant include false certifications of compliance with the Anti-Kickback Statute and the Stark Law.

110.  Defendant's conduct described herein was knowing, as that term is used in the False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

111.  The United States, unaware of the falsity of the records and statements made by, used, or caused to be used by Defendant, approved, paid, participated in, and may continue to approve, pay, or participate in, payments made by federal health care programs for claims that would otherwise not have been approved and paid.

112.  By reason of these false records or statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

27

THIRD CLAIM FOR RELIEF

Violations of the False Claims Act: Conspiracy to Violate the False Claims Act
31 U.S.C. § 3729(a)(1)(C)

113.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

114.    Defendant knowingly conspired with other individuals and agents to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B) and to defraud the United States by causing federal health care programs to pay for false claims submitted in violation of federal law.

115.    By reason of Defendant's conspiracy, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim caused to be submitted.

FOURTH CLAIM FOR RELIEF

Violations of the False Claims Act: Knowing Retention of Overpayments
31 U.S.C. § 3729(a)(1)(G)

116.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

117.    As set forth herein, Defendant presented numerous claims for payment to the United States through federal health care programs and knowingly retained overpayments in violation of 31 U.S.C. § 3729(a)(1)(G) when Defendant failed to repay the money as required by federal law.

118.    For the reasons alleged herein, many of these claims were false within the meaning of the False Claims Act. More specifically, Defendant knowingly and improperly avoided or decreased an obligation to repay money to the United States.

28

119.    By reason of Defendant's conduct, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim caused to be submitted.

### FIFTH CLAIM FOR RELIEF

#### Violations of the New York False Claims Act:  False Claims for Payment
#### *State Finance Law*, Art. 13, § 189(1)(a)

120.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

121.    Through the acts and omissions alleged above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to New York Medicaid for payment or approval, within the meaning of *State Finance Law*, Art. 13, § 189(1)(a).

122.    Defendant violated the New York False Claims Act by submitting, or causing to be submitted, claims for reimbursement from New York, knowing that those claims were ineligible for the payments demanded.

123.    False claims submitted, or caused to be submitted, by Defendant included claims tainted by Anti-Kickback Statute and Stark Law violations.

124.    Each claim submitted as a result of the Defendant's illegal conduct represents a false claim.

125.    New York, unaware of their falsity, paid and may continue to pay claims that would not be paid but for Defendant's unlawful conduct.

126.    Defendant's conduct described herein was knowing, as that term is used in the New York False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

127.   By reason of the false or fraudulent claims, New York has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

### SIXTH CLAIM FOR RELIEF

**Violations of the New York False Claims Act:  Use of False Statements**
*State Finance Law*, Art. 13, § 189(1)(b)

128.   Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

129.   Defendant knowingly used or caused to be made or used false records or statements that were material to false or fraudulent claims for payment submitted to New York Medicaid.  Those false records or statements used or caused to be used by Defendant include false certifications of compliance with the Anti-Kickback Statute and the Stark Law.

130.   Defendant's conduct described herein was knowing, as that term is used in the  New York False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

131.   New York, unaware of the falsity of the records and statements made by, used, or caused to be used by Defendant, approved, paid, participated in, and may continue to approve, pay, or participate in, payments made by New York Medicaid for claims that would otherwise not have been approved and paid.

132.   By reason of these false records or statements, New York has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

<u>SEVENTH CLAIM FOR RELIEF</u>

**Violations of the False Claims Act: Conspiracy to Violate the False Claims Act**
*State Finance Law*, Art. 13, § 189(1)(c)

133.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

134.    Defendant knowingly conspired with other individuals and agents to violate *State Finance Law*, Art. 13, §§ 189(1)(a) and (b) and to defraud New York by causing New York Medicaid to pay for false claims submitted in violation of the New York False Claims Act.

135.    By reason of Defendant's conspiracy, New York has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim caused to be submitted.

<u>EIGHTH CLAIM FOR RELIEF</u>

**Violations of the New York False Claims Act: Knowing Retention of Overpayments**
*State Finance Law*, Art. 13, § 189(1)(h)

136.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

137.    As set forth herein, Defendant presented numerous claims for payment to New York through New York Medicaid and knowingly retained overpayments in violation of *State Finance Law*, Art. 13, § 189(1)(h) when Defendant failed to repay the money as required by the New York False Claims Act.

31

138.   For the reasons alleged herein, many of these claims were false within the meaning of the New York False Claims Act. More specifically, Defendant knowingly and improperly avoided or decreased an obligation to repay money to New York.

139.   By reason of Defendant's conduct, New York has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim caused to be submitted.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Relator respectfully prays for judgment against Defendant as follows:

a.   Treble damages and all applicable civil penalties in the maximum amount allowed by law;

c.   All attorney's fees and costs associated with prosecuting this civil action, as provided by law;

d.   Interest on all amounts owed to the United States, New York, and/or Relator; and

e.   For all other relief the Court deems just and proper.

<u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

October 13, 2020

Respectfully submitted,

**REESE MARKETOS LLP**

By: */s/ Joshua M. Russ*
    Joshua M. Russ (*pro hac* pending)
    Texas Bar No. 24074990
    josh.russ@rm-firm.com
    Brett S. Rosenthal (*pro hac* pending)
    Texas Bar No. 24080096
    brett.rosenthal@rm-firm.com
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
Telephone: (214) 382-9810
Facsimile: (214) 501-0731


**MARK J. FRENTZEL, ESQ.**

By: */s/ Mark J. Frentzel*
    Mark J. Frentzel, Esq.
    New York Bar No. 1966225
    mfrentzel@verizon.net
101 Harbor Towne Centre
1763 Baseline Road
Grand Island, New York 14072
Telephone: (716) 773-2442
Facsimile: (716) 773-4750

**COUNSEL FOR RELATOR**